Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission affirms and adopts the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a pre-trial agreement dated 11 January 2000, and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of this matter.
2. Plaintiff contends that his left ankle injury occurred on or about 21 April 1998.
3. The parties are subject to and bound by the North Carolina Workers' Compensation Act, defendant-employer regularly employing three or more persons as of 21 April 1998.
4. The employee-employer relationship existed between plaintiff and defendant-employer as of 21 April 1998.
5. Plaintiff's average weekly wage was $516.04.
6. Documents stipulated into evidence include all Industrial Commission forms filed in this matter.
 ***********
Based upon all of the competent evidence adduced at the hearing, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff began working for defendant-employer in April 1996 as a grocery selector. Plaintiff testified that in this position, he was required to pull about 175 cases per hour and stack them on a pallet. The weight of the cases varied from ten to sixty pounds. Plaintiff also stated that he was required to jump out of the forklift.
2. On 21 April 1998 plaintiff sustained an admittedly compensable injury by accident within the course of his employment with defendant-employer when he suffered a non-displaced fracture of his left ankle. No surgery was required for the injury; however, plaintiff's leg was placed in a cast.
3. Dr. Jack Rendall initially treated plaintiff for his injuries resulting from the injury by accident. Plaintiff was out of work for periods of time and received total disability benefits during those periods of time. By 23 June 1998 plaintiff's calf circumference showed no atrophy, thereby indicating that his fracture was healed. Dr. Rendall determined at this time that plaintiff was ready to return to work at modified duty. Plaintiff returned to work on 2 July 1998.
4. On 18 August 1998 plaintiff returned to Dr. Rendall complaining of numbness in his left leg. Dr. Rendall did not relate this numbness to the injury of 21 April 1998, and since plaintiff had never complained of numbness before, Dr. Rendall considered this symptom to be a new concern. Dr. Rendall continued plaintiff on modified duty. Plaintiff continued to work and earn wages.
5. A nerve conduction study performed on 25 August 1998 revealed that plaintiff's lower extremities were within normal limits bilaterally. Following a 3 September 1998 examination, Dr. Rendall diagnosed plaintiff with left leg pain and weakness, seemingly related to his position as grocery selector since every time plaintiff performed his duties as expected, plaintiff complained of new problems with his leg. Dr. Rendall also diagnosed plaintiff with conversion symptoms, indicating that some of plaintiff's complaints were psychologically based as opposed to being actual physical problems. Plaintiff's physical examination at this time revealed a healed fracture, his muscles were back to normal; plaintiff was able to walk on his tiptoes and heels, had normal reflexes and all joints had full range of motion. However, plaintiff continued to experience unexplainable numbness upon trying to become more active.
6. On 15 September 1998, plaintiff returned to Dr. Rendall with complaints of continuing severe leg pain which were out of proportion to the objective findings. A bone scan revealed no RSD but possible mild shin splints. The shin splints would not explain plaintiff's complaints of pain since they were located in another area of plaintiff's leg. Upon physical examination, plaintiff was able to squat, bend forward and touch his ankles. He also had good range of motion in his knee and ankle. Despite the objective findings, Dr. Rendall still took plaintiff out of work due to his continued subjective complaints of severe leg pain. This period of time out of work was not causally related to plaintiff's original leg injury.
7. On 30 October 1998, Dr. Rendall released plaintiff to return to light duty work as of 1 November 1998, and to full duty with no restrictions as of 1 December 1998. Plaintiff also reached maximum medical improvement with no permanency rating as of 1 December 1998. Despite the release to full duty, plaintiff made a personal choice not to return to his previous job. There is no credible evidence to suggest that plaintiff was not capable of earning wages at his previous job, and his previous job was made available to him at the same wages as his pre-injury wages. Plaintiff unjustifiably refused this employment, and instead, plaintiff bid for and accepted a lesser paying job with defendant-employer in a sanitation position. Even after being released to full duty, plaintiff unjustifiably continued in the lesser paying position, despite being capable of earning his pre-injury wages.
8. Plaintiff sought a second opinion from Dr. Graves, who offered a 2% permanent partial disability rating; however, this rating does not affect the fact that plaintiff was capable of earning his pre-injury wages as of 1 December 1998.
9. Plaintiff returned to Dr. Rendall in March, April and May 1999, complaining of left leg pain and numbness of unknown etiology. Plaintiff's physical examination and objective findings did not support plaintiff's subjective complaints. Plaintiff walked with a normal gait, he was able to jog up and down the hall with no difficulty; he had normal knee and ankle reflexes, and he had normal pulses and skin temperature. A bone scan revealed normal results as well. Plaintiff's symptoms in Spring 1999 were not causally related to his original injury of 21 April 1998.
10. Plaintiff ultimately relocated to Wilmington, North Carolina, where he worked as a grocery stocker at a rate of $10.50 per hour. After having been treated by Drs. Mahr and Torres, plaintiff then presented to Dr. Thomas Dalton, an anesthesiologist who works with the Center of Pain Management in Wilmington. Based on notes from these two treating physicians and plaintiff's subjective complaints, Dr. Dalton diagnosed plaintiff with post-traumatic left leg neuropathic pain. Dr. Dalton did not have the records of Dr. Rendall when he began treating plaintiff.
11. Upon learning of Dr. Rendall's treatment of plaintiff, and plaintiff's documented full recovery then return of leg pain several months later, Dr. Dalton was unable to relate plaintiff's current leg condition to his accident of April 1998. Dr. Dalton indicated that plaintiff's examinations with his office had been inconsistent with respect to the physical activities plaintiff was able to perform. Dr. Dalton also stated that he was suspicious of secondary gain issues from the inception of treating plaintiff.
12. Plaintiff's primary interaction with Dr. Dalton was within a legal setting as opposed to a medical one. Plaintiff often requested letters from Dr. Dalton regarding his condition, but never requested medication or treatment. Plaintiff also has not complied on several occasions with Dr. Dalton's treatment plan, while presumably being in severe pain. These factors have resulted in Dr. Dalton's well-founded suspicion as to plaintiff's forthrightness in making pain complaints. In fact, Dr. Dalton would not be surprised if he never saw plaintiff again upon conclusion of these legal proceedings.
13. Despite his suspicions of plaintiff, Dr. Dalton continued to treat plaintiff's "symptoms" aggressively, including recommending a spinal cord stimulator. Dr. Dalton hopes to discover the true nature of plaintiff's condition once plaintiff is faced with the option of having a large needle inserted into his back, along with wires that are then connected to the stimulator. The Full Commission does not find that the spinal cord stimulator is a medical treatment necessary to effect a cure or provide relief of plaintiff's symptoms. The Commission also finds that plaintiff's pain complaints after 1 December 1998, are not related to his original injury of 21 April 1998; therefore, plaintiff is not entitled to additional workers' compensation benefits after this date.
14. The Commission gives greater weight to the 0% rating offered by Dr. Rendall, since Dr. Rendall treated plaintiff shortly after his injury and for a longer period of time and was more familiar with plaintiff's condition.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff's current leg symptoms and condition are not causally related to his 21 April 1998 injury by accident. N.C. Gen. Stat. §97-2(6).
2. Plaintiff is currently neither temporarily totally disabled nor permanently partially disabled as a result of his 21 April 1998 injury by accident. N.C. Gen. Stat. §§ 97-29; 97-31.
3. Plaintiff is not entitled to additional workers' compensation benefits, including temporary partial disability benefits. Plaintiff unjustifiably refused suitable employment when he was capable of returning to the position that offered wages equal to his pre-injury wages. N.C. Gen. Stat. §§ 97-29; 97-30; 97-31.
4. Due to plaintiff's incredible complaints of continued and severe leg pain, and his treating physicians' opinions that plaintiff has been less than truthful with respect to his complaints, including secondary gain concerns, and because plaintiff's present complaints are unrelated to his original injury, plaintiff is not entitled to payment of medical expenses after 1 December 1998. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff's claim for additional workers' compensation benefits should be, and the same is hereby DENIED.
2. Each side shall bear its own costs.
This the ___ day of November, 2001.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER